890 A.2d 933

LINDA FITZGERALD, PETITIONER–RESPONDENT, v. TOM CODDINGTON STABLES, RESPONDENT–RESPONDENT, AND N.J. HORSE RACING INJURY COMPENSATION BOARD, RESPONDENT–APPELLANT.

Argued October 11, 2005—Decided January 25, 2006.

24

*Francis T. Giuliano* argued the cause for appellant.

*Kenneth L. Thomson* argued the cause for respondent Linda Fitzgerald (*Schottland, Manning, Caliendo & Thomson,* attorneys).

*Nicholas L. Krochta* argued the cause for respondent Tom Coddington Stables (*Kulick, Brennan & Krochta,* attorneys).

*Juliet T. Wyne,* Deputy Attorney General, argued the cause for *amicus curiae* New Jersey Racing Commission (*Peter C. Harvey,* Attorney General of New Jersey, attorney; *Patrick DeAlmeida,* Assistant Attorney General, of counsel).

*Mark D. Schorr* submitted a brief on behalf of *amicus curiae* Standardbred Breeders & Owners Association of New Jersey, Inc. (*Sterns & Weinroth,* attorneys).

Justice RIVERA–SOTO delivered the opinion of the Court.

In this appeal, we address the seeming contradiction that arises from the intersection of two separate statutory workers' compensation insurance requirements applicable to employees in New Jersey's horse racing industry: the broad obligation of all horse trainers to provide private workers' compensation insurance to their employees under *N.J.S.A.* 34:15–134.1 versus the require-

ment that the New Jersey Horse Racing Injury Compensation Board (Compensation Board or Board) "secure workers' compensation insurance coverage for horse racing industry employees." *N.J.S.A.* 34:15–134a.

Both the Division of Workers' Compensation judge and the Appellate Division held that the Board's statutory obligation trumps that of the private employer because, in their view, the petitioner in this action fell squarely within the statute's definition of a "horse racing industry employee" under *N.J.S.A.* 34:15–131. We disagree, and hold that the petitioner does not fall within the plain meaning of the statutory definition of a "horse racing industry employee," a conclusion also mandated by the statute's purpose and context, and legislative history. We further hold that the workers' compensation scheme established pursuant to the New Jersey Horse Racing Injury Compensation Board Act (Horse Racing Compensation Act), *N.J.S.A.* 34:15–129 to –142, requires that a horse trainer not employed by an owner must be covered by private workers' compensation insurance provided by his employer, and that the workers' compensation coverage provided by the Board is intended as a safety net for those instances where "serious injuries have been sustained for which there is no coverage." *N.J.S.A.* 34:15–130.

I.

Commencing in early 2001, petitioner Linda Fitzgerald, who by then had over forty years of experience in the riding, grooming, training and ownership of both thoroughbred and standardbred horses,[1] was employed as a licensed second trainer (although that license was not current) and as a licensed groom by defendant Tom Coddington Stables (Coddington Stables), a race horse trainer operating out of Showplace Farms in Millstone Township,

---

[1] Thoroughbred horses are "a breed of horse originating from a cross of Arabian stallions with English mares" and are raced by a jockey in a saddle, while standardbred horses are "[o]ne of an American breed of horses developed for harness racing." *Webster's II New College Dictionary* 1148, 1075 (1995).

Monmouth County, New Jersey. As an employer in the State of New Jersey, Coddington Stables is required to "make sufficient provision for the complete payment of any obligation [it] may incur to an injured employee, or his dependents under the provisions of [the New Jersey Workers' Compensation Act, *N.J.S.A.* 34:15–7 *et seq.*]" *N.J.S.A.* 34:15–71. Coddington Stables satisfied its statutory obligation to provide workers' compensation coverage to plaintiff by the purchase of workers' compensation insurance from a private carrier.

On April 11, 2001, in the course of her employment with Coddington Stables and while caring for a horse not owned by her employer, petitioner was injured when the horse suddenly jumped and struck her. She thereafter filed two separate petitions before the Division of Workers' Compensation. In the first, petitioner sought workers' compensation benefits from her employer, Coddington Stables, under its statutorily required workers' compensation insurance coverage. In the second, petitioner sought workers' compensation from the Board, asserting that she was a "horse racing industry employee" as defined under *N.J.S.A.* 34:15–131, and, hence, was entitled to workers' compensation coverage from the Board under the Horse Racing Compensation Act. The issue joined, then, was not whether petitioner was entitled to workers' compensation benefits, but instead which entity was to bear the burden of that coverage: her employer, Coddington Stables, or the Board.

Ruling on the two conflicting petitions, the workers' compensation judge "dismissed Coddington Stables and decided that the New Jersey Horse Racing Injury Compensation Board is responsible for all payments due petitioner arising out of this accident on April 11, 2001." Characterizing the Horse Racing Compensation Act as "confusing," the workers' compensation judge nonetheless observed that the Horse Racing Compensation Act was intended to "correct" what the Legislature deemed to be "confusion as to coverage of employees involved in the horse racing industry...." Finding that petitioner qualified under the statutory definition of a

"horse racing industry employee" found in *N.J.S.A.* 34:15–131, the workers' compensation judge held that such finding triggered the Board's obligation to provide workers' compensation coverage to petitioner under *N.J.S.A.* 34:15–134a. Finally, noting the dueling nature of the coverages at issue here, the workers' compensation judge focused on the last sentence of *N.J.S.A.* 34:15–135d: "To the extent that a horse racing industry employee is also covered by duplicate coverage procured pursuant to another policy of workers' compensation insurance, the coverage procured by the [Board] pursuant to [the Horse Racing Compensation Act] shall be considered primary." In synthesis, the workers' compensation judge concluded that (1) petitioner fit within the statutory definition of a "horse racing industry employee;" (2) the Board was statutorily obliged to provide workers' compensation coverage to all defined horse racing industry employees; and (3) the Board's obligation and coverage were primary.[2]

The Appellate Division affirmed. *Fitzgerald v. Tom Coddington Stables*, 370 *N.J.Super.* 582, 851 *A.2d* 778 (App.Div.2004). The panel noted that the Board, focusing on the statutory definition of a "horse racing industry employee," argued that such definition "applies only to the employees of the actual owner of the horse."

---

[2] The conclusions reached by the workers' compensation judge were premised on an incorrect factual finding. According to the judge, petitioner's injury arose when she "was taking care of a horse owned by Coddington." However, the Appellate Division noted, and the transcripts of the proceedings before the workers' compensation judge bear out, that

> the Judge of Compensation misstated that Coddington Stables owned [the horse that injured petitioner]. The owner of [that horse] was actually an individual identified as 'Iceachello' (phonetic). Petitioner was not an employee of [the horse owner], nor was any evidence presented that Coddington was acting as an employee of [the horse owner] in his capacity as a trainer.

> *Fitzgerald v. Tom Coddington Stables*, 370 *N.J.Super.* 582, 584, 851 *A.2d* 778 (App.Div.2004). Our independent review of the testimony adduced before the workers' compensation judge confirms the accuracy of the panel's observations. We are confident that, had this factual error been corrected in a timely manner before the workers' compensation judge, the outcome would have been consistent with the result we reach today.

*Id.* at 584, 851 *A.2d* 778. As couched by the Appellate Division, the Board "argue[d] that [petitioner] should not be considered a statutory 'horse racing industry employee' because at the time of the incident, although working for [Coddington Stables] and licensed by the Racing Commission, [petitioner] was not working on a horse owned by Coddington Stables." *Ibid.* Reasoning broadly that "[t]hose employed by a trainer are covered by the statute even though the trainer may not be an employee of the horse's owner[,]" *id.* at 585, 851 *A.2d* 778, the panel "reject[ed] the Compensation Board's arguments as without merit and conclude[d] that [petitioner] was a licensed horse racing industry employee and working for an owner and trainer of horses in the industry and was covered by the statute." *Id.* at 584, 851 *A.2d* 778.

We originally denied the Board's petition for certification. 183 *N.J.* 212, 871 *A.2d* 90 (2005). We later granted the Board's motion for reconsideration, 183 *N.J.* 581, 874 *A.2d* 1101 (2005),[3] and, upon reconsideration, granted the Board's petition for certification. 185 *N.J.* 35, 878 *A.2d* 852 (2005).

## II.

The Board advances two principal arguments. First, the Board asserts that, as a matter of statutory interpretation, the Appellate Division's broad reading of the definition of "horse racing industry employee" is contrary to the Horse Racing Compensation Act. According to the Board, something more than bare proofs that a petitioner was a licensed trainer and was employed in the horse racing industry is required to meet that definition. Second, the Board urges that the panel's interpretation of the definition of a "horse racing industry employee" is inconsistent with the purposes underlying coverage, the legislative history of the definition, and

---

[3] The Compensation Board's motion for reconsideration was untimely. Therefore, the Compensation Board also sought, and we granted, leave to file its motion for reconsideration as within time.

the entire workers' compensation scheme reflected in the Horse Racing Compensation Act. In those arguments, the Board is supported by *amici curiae* the New Jersey Racing Commission and the Standardbred Breeders & Owners Association of New Jersey, Inc.

Coddington Stables hews closely to the determinations of both the workers' compensation judge and the Appellate Division, and argues that petitioner clearly falls within the statutory definition of a "horse racing industry employee." It also argues that, as a matter of law, petitioner is entitled to primary workers' compensation coverage from the Board, thereby relieving Coddington Stables from any such obligation.[4]

### III.

In general, New Jersey's long-standing and comprehensive statutory scheme of workers' compensation coverage is "designed to establish a no fault system of compensation for workers who are injured or contract a disease in the course of employment." *Brock v. Pub. Serv. Elec. & Gas Co.*, 325 *N.J.Super.* 582, 588, 740 *A.*2d 167 (App.Div.1999), *certif. denied,* 163 *N.J.* 77, 747 *A.*2d 285 (2000). We have consistently held that our statutory workers' compensation scheme "is remedial social legislation and should be given liberal construction in order that its beneficient purposes may be accomplished." *Torres v. Trenton Times Newspaper,* 64 *N.J.* 458, 461, 317 *A.*2d 361 (1974). *See also Med. Diagnostic Assoc. v. Hawryluk,* 317 *N.J.Super.* 338, 343, 722 *A.*2d 122 (App.Div.1998), *certif. denied,* 160 *N.J.* 89, 733 *A.*2d 494 (1999) (New Jersey's workers' compensation scheme is "a form of remedial legislation designed to relieve the injured employee of the burden of paying for his own medical care and to replace his lost

---

4 This appeal addresses solely which party bears the burden of providing petitioner's workers' compensation benefits and counsel for petitioner represented at oral argument that the outcome of this appeal will have no substantive effect on petitioner. Hence, no reference is made to any arguments petitioner may have advanced.

wages.") (citation and internal quotation marks omitted). From its genesis in 1911, *see Sexton v. Newark Dist. Tel. Co.*, 84 *N.J.L.* 85, 86 *A.* 451 (Sup.Ct.1913), *aff'd,* 86 *N.J.L.* 701, 91 *A.* 1070 (E. & A.1914), New Jersey's workers' compensation statutes have remained true to that goal. More than a half-century after its enactment yet still forty years ago, we described the core purpose of our workers' compensation statutes in words that resonate as clearly today:

> The ultimate purpose of the [workers' compensation statutes] is to provide a dependable minimum of compensation to insure security from want during a period of disability. It is the understanding of most workers that the benefits of the [workers' compensation statutes] apply to accidents arising out of and in the course of their employment. Consistent with its humanitarian ideals, our [workers' compensation statutory scheme] has always been liberally construed in favor of coverage. *Cuna v. Bd. of Fire Comm'rs,* 42 *N.J.* 292, 298 [200 *A.*2d 313] (1964). [*Naseef v. Cord, Inc.,* 48 *N.J.* 317, 325–26, 225 *A.*2d 343 (1966).]

It is, then, against this backdrop that we must gauge the competing interests here.

## A.

In this endeavor, we are guided by established principles of statutory construction. As we recently explained,

> [t]he Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language. We ascribe to the statutory words their ordinary meaning and significance, and read them in context with related provisions so as to give sense to the legislation as a whole. It is not the function of this Court to rewrite a plainly-written enactment of the Legislature [ ]or presume that the Legislature intended something other than that expressed by way of the plain language. We cannot write in an additional qualification which the Legislature pointedly omitted in drafting its own enactment, or engage in conjecture or surmise which will circumvent the plain meaning of the act. Our duty is to construe and apply the statute as enacted.
>
> A court should not resort to extrinsic interpretive aids when the statutory language is clear and unambiguous, and susceptible to only one interpretation.... On the other hand, if there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction. We may also resort to extrinsic evidence if a plain reading of the statute leads to an absurd result or if the overall statutory scheme is at odds with the plain language. [*DiProspero v. Penn,* 183 *N.J.* 477, 492–93, 874 *A.*2d 1039 (2005) (citations and internal quotation marks omitted).]

The application of these principles informs our inquiry and requires an examination of the statute in search of its plain meaning. The reach of the Horse Racing Compensation Act concededly is narrow: it addresses one legal requirement, the provision of workers' compensation coverage, to a limited segment of employees within a specified industry. Because both the workers' compensation judge and the Appellate Division determined that petitioner fit within that narrow band of employees entitled to coverage from the Board as "horse racing industry employee[s]," a broad review of the Horse Racing Compensation Act is helpful to provide context to this analysis.

### B.

We first focus, as we must, on the Horse Racing Compensation Act itself. Originally adopted as *L.* 1995, *c.* 329, §§ 1 to 14, eff. Jan. 5, 1996, the Horse Racing Compensation Act starts from the proposition that "current law already requires virtually all employers to provide for the payment of workers' compensation benefits to injured employees, . . ." *N.J.S.A.* 34:15–130. Addressing the specific purpose of the Horse Racing Compensation Act, the Legislature declared that "because of the unique nature of the horse racing industry, difficulties have arisen in ensuring that [workers' compensation] coverage is provided to employees." *Ibid.* Listing two examples where workers' compensation coverage either might be unavailable or the subject of confusion,[5] the Legislature declared that, within the horse racing industry, "serious injuries have been sustained for which there is no coverage." *Ibid.* The Legislature explained that

[i]t is, therefore, in the public interest to ensure that workers' compensation coverage is available to persons employed in the thoroughbred and standardbred horse racing industries in New Jersey by collectively securing workers' compensation insurance coverage for such persons, the costs of which shall be funded by the horse racing industry, and the assessments for funding that coverage shall be

---

[5] Those are "out-of-State owners [who] are sometimes unaware of their obligation to provide [workers' compensation] coverage, or because a jockey may ride the horses of more than one owner. . . ." *N.J.S.A.* 34:15–130.

calculated separately for the thoroughbred and standardbred industries, based on their respective experience.
*[Ibid.]*

Stated differently, the purpose of the Horse Racing Compensation Act was to fill a gap in workers' compensation coverage unique to the horse racing industry.

In order to implement those goals, the Legislature established the Board, *N.J.S.A.* 34:115–132, and charged it with the obligation to "secure workers' compensation insurance coverage for horse racing industry employees." *N.J.S.A.* 34:15–134a. This specialized workers' compensation coverage is funded directly by an assessment upon the gross overnight purses paid to either thoroughbred or standardbred horse owners not to exceed three percent of such purses. *N.J.S.A.* 34:15–134b and –134c. Specifically, no public funds are to be used to provide the workers' compensation coverage required by the Horse Racing Compensation Act. *N.J.S.A.* 34:15–134c.

By the adoption of this remedial legislation, the Legislature did not intend to provide blanket coverage to every person employed in the horse racing industry. Indeed, consistent with the stated public policy goals the Legislature sought to achieve, the Horse Racing Compensation Act distinguishes between horse owners and horse trainers. As noted earlier, horse owners are the employers subject to the obligations of the workers' compensation scheme established by the Horse Racing Compensation Act, *see N.J.S.A.* 34:15–134b, –134c, and –135, and, as such, bear the burden of funding that scheme in its entirety. *N.J.S.A.* 34:15–134b and –134c.

In contrast, and "[n]otwithstanding any provision of [the Horse Racing Compensation Act] as amended, a trainer shall carry compensation insurance covering the trainer's employees as required by law." *N.J.S.A.* 34:15–134.1. Thus, although the specific workers' compensation obligation of a horse owner arises under the provisions of the Horse Racing Compensation Act, the workers' compensation obligation of a horse trainer is the same as the

general workers' compensation obligations of any non-horse owner employer under New Jersey's Workers' Compensation Act, *N.J.S.A.* 34:15–1 to –69.3, Employers' Liability Insurance Law, *N.J.S.A.* 34:15–70 to –102, and Workers' Compensation Security Fund Act, *N.J.S.A.* 34:15–103 to –128.

That contextual setting sets the stage for the determination whether petitioner satisfies the statutory definition of a "horse racing industry employee" entitled to workers' compensation benefits from the Board under the Horse Racing Compensation Act.

## C.

■ As noted earlier, the Horse Racing Compensation Act requires that the Board "secure workers' compensation insurance coverage for horse racing industry employees." *N.J.S.A.* 34:15–134a. At the time of petitioner's injury, the Horse Racing Compensation Act defined a "horse racing industry employee" as

a jockey, jockey apprentice, or driver engaged in performing services for an owner in connection with the racing of a horse in New Jersey. In addition, a trainer who otherwise would be considered an employee of the owner pursuant to [the Workers' Compensation Act], as well as any person assisting such trainer who is licensed or required to be licensed by the [Racing Commission], is a horse racing industry employee for the purposes of [the Horse Racing Compensation Act].
[*N.J.S.A.* 34:15–131.] 6

Taking that definition in isolation, both the workers' compensation judge and the Appellate Division concluded that petitioner satisfied the requirements of a "horse racing industry employee." They therefore determined that petitioner was entitled to workers' compensation benefits from the Board under the Horse Racing Compensation Act, which coverage also was determined to be primary to the workers' compensation coverage provided by her employer, Coddington Stables.

As a matter of the plain meaning of this statute, we disagree. Under *N.J.S.A.* 34:15–131, only three categories of persons qualify as a "horse racing industry employee." It is clear that, as a

---

6 This definition has been amended since petitioner's claim arose. *See infra,* 186 *N.J.* at 38 n. 9, 890 *A.2d* 943 (2006).

employee of a trainer, petitioner does not qualify under the first category, which includes only "jockey[s], jockey apprentice[s] or driver[s] engaged in performing services *for an owner* in connection with the racing of a horse in New Jersey." *Ibid.* (emphasis supplied). The second category—"a trainer who otherwise would be considered an employee of the owner"—is similarly unavailing. As the Appellate Division recognized, "[p]etitioner was not an employee of [the owner of the horse that injured her], nor was any evidence presented that Coddington was acting as an employee of [the horse owner] in his capacity as a trainer." *Fitzgerald v. Tom Coddington Stables,* 370 *N.J.Super.* 582, 584, 851 *A.*2d 778 (App. Div.2004). Finally, for that same reason, petitioner does not qualify under the third category under *N.J.S.A.* 34:15–131: a person who is licensed or required to be licensed by the New Jersey Racing Commission who is assisting "a trainer who otherwise would be considered an employee of the owner." Therefore, on a straightforward reading of the plain meaning of the statute, petitioner does not qualify as a "horse racing industry employee" pursuant to *N.J.S.A.* 34:15–131.

Moreover, that plain meaning of Section 131 is supported by the statutory context of the Horse Racing Compensation Act. *Di-Prospero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citations omitted) (Although "[w]e ascribe to the statutory words their ordinary meaning and significance," we are nonetheless required to read legislative enactments "in context with related provisions so as to give sense to the legislative whole."). It is to that task that we now turn.

D.

It is evident that the Horse Racing Compensation Act, when viewed as a whole, is designed as a safety net to catch those employed in the horse racing industry who are employed by horse owners and are without workers' compensation coverage. For that reason, the Legislature identified both employees of out-of-State horse owners who may be ignorant of New Jersey's workers' compensation requirements as well as jockeys who ride the horses

of more than one owner as those who would benefit from this statutory scheme, *N.J.S.A.* 34:15–130; for that reason, the Legislature placed the burden of paying for those workers' compensation benefits exclusively on owners, and not trainers, by assessing a fee against purses paid to owners, *N.J.S.A.* 34:15–134b, –134c; for that reason, the Legislature reaffirmed the separate and overriding obligation of trainers to secure and maintain separate workers' compensation coverage "as required by law." *N.J.S.A.* 34:15–134.1. Thus, in its proper context, the statutory definition of a "horse racing industry employee" cannot be as broad as either the workers' compensation judge or the Appellate Division would have it.

In furtherance of the goal of providing workers' compensation coverage to those in the horse racing industry who otherwise were without coverage, the Legislature limited the universe of beneficiaries of that workers' compensation scheme to those who are "engaged in performing services for an owner in connection with the racing of a horse in New Jersey" or those horse trainers "who otherwise would be considered an employee of the owner[.]" *N.J.S.A.* 34:15–131. The Legislature separately required that trainers, not owners, comply with the general workers' compensation requirements for their employees. *N.J.S.A.* 34:15–134.1. The Legislature even addressed those instances where a person entitled to benefits under the Horse Racing Compensation Act was also a beneficiary under an owner's workers' compensation insurance: in those limited instances, the workers' compensation "coverage procured by the [Board] pursuant to [the Horse Racing Compensation Act] shall be considered primary." *N.J.S.A.* 34:15–135d. In short, the legislative scheme evinces a clear limited purpose in coverage, one that is also buttressed by the statute's legislative history.

## E.

In keeping with the limited scope of eligible beneficiaries under the Horse Racing Compensation Act, a "horse racing industry employee" was originally defined as

a jockey, jockey apprentice, exercise rider, driver, and driver-trainer performing services for an owner in connection with the exercising or racing of a horse in New Jersey. In addition, a trainer who otherwise would be considered an employee of the owner pursuant to R.S. 34:15–1 et seq. is a horse racing industry employee, for the purposes of this act.

*L.* 1995, *c.* 329, § 3, eff. Jan. 5, 1996. Thus, the original iteration of the definition of a "horse racing industry employee" was closely tethered to that employee's employment with or by a horse owner.

That definition, as codified at *N.J.S.A.* 34:15–130, was first amended in 1998. Described in Senate Bill No. 91 of 1998 as "extend[ing] workers' compensation coverage through the New Jersey Horse Racing Injury Compensation Board to additional backstretch employees," *L.* 1998, *c.* 11, § 1, eff. May 1, 1998, amended the relevant portion of *N.J.S.A.* 34:15–131 and expanded the scope of coverage to include not only the employees of a horse owner, but also "any other person licensed by the commission, who is an employee of ... a trainer and engaged in performing services for an owner in connection with the exercising or racing of a horse in New Jersey."

That point was made clear in the sponsors' statement to the 1998 amendments. *L.* 1998, *c.* 11, § 1. The statement begins: "The New Jersey Horse Racing Injury Compensation Board was established by P.L.1995, c. 329 (C.34:15–129 et seq.) to provide workers' compensation insurance coverage to certain racing industry employees (jockeys, apprentice jockeys, exercise riders, drivers and driver-trainers) *employed by horse owners.*" (emphasis supplied). However, the statement continues:

> This bill would extend the coverage provided through the board to additional backstretch employees by requiring the board to also cover an assistant trainer, stable employee, or any other person licensed by the New Jersey Racing Commission, who is the employee of an owner or a trainer and engaged in performing services in connection with the exercising or racing of a horse in New Jersey. *Owners and trainers would be assessed separately for the cost of insurance or self-insurance attributable to the respective employees of owners and trainers.* The thoroughbred and standardbred industries would continue to be assessed separately. (emphasis supplied).

Thus, under the 1998 amendments, the Horse Racing Compensation Board Act required that the Board provide workers' compen-

sation insurance coverage for all enumerated employees of *both* owners *and* trainers, which coverage was to be paid for by assessments against both owners and trainers.[7]

Realizing it had expanded greatly the scope of coverage, the Legislature quickly contracted the definition of a "horse racing industry employee" codified in *N.J.S.A.* 34:15–131 to something even more limited than its original iteration in 1995. Specifically, *L.* 1999, *c.* 378, § 1, eff. Jan. 14, 2000, deleted from the definition of a "horse racing industry employee" any "exercise rider[s], ... driver-trainer[s], assistant trainer[s], stable employee[s], or any other person licensed by the commission, who is an employee of an owner or a trainer[.]"[8] Because petitioner's injury occurred in April 2001, it was this version of *N.J.S.A.* 34:15–131 that governs petitioner's claim.[9] That definition does not include a trainer

---

[7] We note, parenthetically, that had the 1998 amendments provided the rule of decision here, the interpretation advanced by Coddington Stables would have been correct.

[8] As described in its sponsors' statement, the original Senate Bill for the 1999 amendments, Senate Bill No. 2155 of 1999, introduced Oct. 18, 1999, sought to "eliminate[ ] the provision of workers' compensation coverage through the New Jersey Horse Racing Injury Compensation Board for employees of standardbred trainers. The bill does require that standardbred trainers continue to provide workers' compensation coverage independently for their employees as required by regulation of the New Jersey Racing Commission." Thus, Senate Bill No. 2155 originally left intact the statutory coverage for thoroughbred trainers. That distinction was eliminated in the Assembly, which adopted floor amendments to excise *all* trainers not employed by a horse owner, be they thoroughbred or standardbred trainers, from coverage under the Horse Racing Compensation Act.

[9] A "horse racing industry employee" is now defined as:

a jockey, jockey apprentice, or driver engaged in performing services for an owner in connection with the racing of a horse in New Jersey. "Horse racing industry employee" also means an exercise rider of a thoroughbred horse for the period of time during which he or she is employed as an exercise rider of a thoroughbred horse at a horse racetrack in this State, who is licensed by the [Racing Commission] and from whose wages deductions and withholdings as required or authorized by State or federal law are taken, and a trainer who otherwise would be considered an employee of the

employed by a horse trainer, and not by an owner, because a horse trainer is twice statutorily required—both generally in the Workers' Compensation Act as well as expressly in the Horse Racing Compensation Act—to provide private workers' compensation coverage to its employees.

### IV.

In the end, expanding the reach of the Horse Racing Compensation Act to duplicate coverage for those who are explicitly required to provide workers' compensation under the Workers' Compensation Act leads to an absurd result and would relegate *N.J.S.A.* 34:15–134.1 to mere surplusage. Because the plain language and clear purpose of the Horse Racing Compensation Act require it, we hold that petitioner does not fall within the statutory definition of a "horse racing industry employee;" that the workers' compensation scheme established by the Horse Racing Compensation Act requires that a horse trainer not employed by an owner must be covered by private workers' compensation coverage provided by his employer; and that the workers' compensation coverage provided by the Board is intended as a safety net for those instances where "serious injuries have been sustained for which there is no coverage." *N.J.S.A.* 34:15–130.

The judgment of the Appellate Division is reversed and the petitions are remanded to the Division of Workers' Compensation for entry of an order dismissing the petition against the Board and reinstating the petition against Coddington Stables.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LAVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*Opposed*—None.

---

owner pursuant to [the Workers' Compensation Act], as well as any person assisting such trainer who is required to be licensed by the [Racing Commission].

[*N.J.S.A.* 34:15–131, as amended by *L.* 2004, *c.* 119, § 1, eff. Aug. 8, 2004.]